UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____  )
                                 )
UNITED STATES OF AMERICA    )          Criminal No. 14-CR-10221-WGY
                                 )
            v.                   )
                                 )
MICHAEL AFFA,                    )
ANDREW AFFA,                     )
MITCHELL BROWN,                  )
CHRISTOPHER PUTNAM, and     )
CHRISTOPHER NIX,                 )
a/k/a GABE NIX,                  )
                                 )
        Defendants.              )
_____  )

## UNITED STATES' SENTENCING MEMORANDUM AS TO MICHAEL AFFA

The United States submits this memorandum in advance of the sentencing of the

defendant Michael Affa.  On September 8, 2015, Affa pleaded guilty to all counts against him in

the Indictment pursuant to a plea agreement entered into with the government under Federal Rule

of Criminal Procedure 11(c)(1)(C).  The conduct for which he was convicted occurred in 2013

and 2014, when Affa, who was a New Jersey-based stock promoter, engaged in a stock

manipulation scheme relating to a publicly traded company called Amogear Inc. ("Amogear").

At the time, Affa was acquainted with an individual who had previously been an active stock

promoter in Boston, but who was cooperating with the Federal Bureau of Investigation (the

"FBI") from 2012 through 2014 (the "CW"), while still maintaining the guise of his previous

employment.  After the CW became a cooperator, he and Affa continued to chat, this time in

recorded conversations, and in mid-2013, the two started to discuss the possibility of Affa

joining the CW and others in a scheme to artificially inflate the value of Amogear, which

purported to be an apparel company.  As the CW explained to Affa several times, however, in reality Amogear was a shell company with no assets or operations.  Affa eagerly agreed to participate in the scam and, over the next few months, conferred with the CW and others to plan several aspects of the stock manipulation scheme.  The scheme was ready to take flight on February 10, 2014, when the United States Securities and Exchange Commission (the "SEC") halted trading before the investing public, lured by promotions being run by Affa and his coconspirators, started buying Amogear shares being floated by the conspirators.

At the end of the day, given the nature and circumstances of this offense, the need to promote respect for the law and provide a deterrent effect, and Affa's history and characteristics, the United States respectfully submits that a period of incarceration of 44 months is necessary in this case in order to meet the goals of 18 U.S.C. § 3553(a).

## BACKGROUND[1]

In 2012, Affa was in the business of promoting stocks for compensation, usually by arranging for blast e-mails to be sent out touting a specific stock.  In this regard, Affa was well-acquainted with pump-and-dump schemes, which generally refer to the artificial inflation of the price of a publicly traded stock, orchestrated by individuals who control a substantial portion of the company's shares, and who then divest themselves of the shares by selling them on the open market after the price inflation has occurred.  (See PSR ¶ 10.)  These types of schemes are typically pursued through certain well-worn mechanisms, such as promotional campaigns featuring news items about the company that frequently contain false and misleading

---

[1]  Under the terms of Affa's plea agreement, the defendant has waived any right that he has to the determination of disputed United States Sentencing Guidelines enhancements by a jury beyond a reasonable doubt, as well as any right to an evidentiary hearing.  (See Michael Affa Plea Agreement, Docket Number 120, ¶ 4.)  Rather, he has agreed that the Court can resolve any such dispute by a preponderance of the evidence, and in reliance on the agreed-upon statement of facts as well as any supplemental materials provided to the Court which are consistent with that statement of facts.  (See id. ¶¶ 1, 4.)

information, and coordinated trading of the stock to simulate market interest in the company, as well as to drive the price of the stock up.  (See id.)

Based on his recorded conversations with the CW, Affa was no stranger to the intricacies of pump-and-dump schemes.  For example, in a conversation held on May 9, 2012, Affa asked the CW's advice regarding a stock promotion, inquiring whether, if Affa hired a number of promoters to participate in the same promotion on its first day, it would be too obvious of a pump-and-dump; specifically, Affa wondered whether use of that many promoters "really kind of spell[s] out pump-and-dump at that point."[2]  (Recording of 5/9/12 Call, submitted as Exhibit A, at 10:00-11:00.)   In the same general timeframe, Affa suggested to the CW that the two of them would be well-served by gaining control over a shell company, which they could then profit from, presumably by inflating the value of its stock and dumping it into the market.  (See Recording of 6/14/12 Call, submitted as Exhibit B, at 3:51-4:22;[3] Recording of 6/18/12 Call, submitted as Exhibit C, at 00:49-3:18.)

Eventually, Affa's wish to exercise control over a shell by which he and the CW could run a pump-and-dump scheme was realized, when the CW offered him an opportunity to participate in the Amogear caper, which the CW had previously been discussing with

---

[2]  Quotations are taken from the Assistant United States Attorneys' notes of recorded conversations that have been provided to the defense.  While they do not purport to be verbatim transcripts, the government believes these quotations to be accurate.  The government is filing a separate Appendix today with copies of several recordings for the Court's consideration at sentencing.

[3]  In this portion of the recording, in the context of discussing someone else's promotion, Michael Affa says:
MICHAEL AFFA: I mean bro, this other one did what?  F***ing 10, 12 million bucks?
CW: Oh yeah, yeah, listen, f***ing, if you're, uh, if you're, if you're on the small partnership side on that deal, it's well worth it, you know?
MICHAEL AFFA: Yeah, you and I grab a shell, and you know we can get 8 million shares of something at f***ing 30 cents, 40 cents . . . I don't give a s**t if we give the rest away, would you? . . . Grab a million bucks apiece, take a [inaudible] and do another one.
CW: [Laughs] I like it.

codefendants Christopher Putnam and Christopher Nix, as Affa was aware.  (PSR ¶ 16.)  Affa readily agreed and jumped into the scheme with both feet, engaging in dozens of conversations with the CW as they laid out how the various aspects of the pump-and-dump would work.  (See PSR ¶ 17.)  These discussions included the minutiae of a classic manipulative stock scheme, such as releasing a promotional campaign notwithstanding the fact that Amogear was a shell company with no operations or assets, carving up the stock to be sold so as to disguise the true ownership of it, and engaging in coordinated trading to deceive the public about the volume of trading in, and the value of, Amogear stock.  Affa was intimately involved in all of these activities.

> *Affa Enthusiastically Participated in the Scheme to Pump and Dump Amogear Stock, which Affa Knew Was Inherently Worthless.*

During the course of their discussions, the CW explained to Affa, on numerous occasions, that Amogear was a shell company with no operations or assets.  For example, on August 2, 2013, the CW informed Affa that "at the beginning, we were going to fund [Amogear] . . . it didn't happen, so we were never really able to fund the company, get anything going with it.  So really all it is is, we got like a box of boxing gloves, and some shirts and some sweatshirts, and we got the Gronkowski news announcement, that's really all we have."  (Recording of 8/2/13 Call, submitted as Exhibit D, at 3:55- 4:14.)[4]  Even with no operations, however, the CW, in the same call, suggested that the two could generate a number of headlines about Amogear for the planned promotional campaign.  In response, Affa asked the CW to e-mail him the proposed promotional headlines, and further suggested that once they had cleared Amogear stock for

---

[4]  The reference to "Gronkowski" was to New England Patriots player Rob Gronkowski, who was going to be the subject of a press release during the promotional campaign announcing that he was affiliated with Amogear.

trading, Affa knew of a trader who could assist with the trading of the stock.  (See id. at 4:50-6:30.)

In this regard, there was no question that Amogear was a company with no prospects whatsoever, and that the news announcements that Affa and the CW discussed were nothing more than window dressing for the promotional campaign that they were planning to run to artificially inflate the value of essentially worthless stock.  On August 5, 2013, in a conversation that the two were engaged in regarding Amogear—specifically selling all of the Amogear shares into the market for a total of $5-6 million—the CW stressed that all he wanted was to sell all of the Amogear shares ("get this one out the door") and move on to the next two stock deals that he had lined up.  (Recording of 8/5/13 Call, submitted as Exhibit E, at 9:14-10:00.)  He then added that "I've been carrying the [Amogear] deal by myself and, you know, we weren't able to accomplish the things that we'd hoped to, so there's really nothing there except some news announcements.  We've got the Gronk press that we can put out, *which I think will help the stock, and just f\*\*\*ing get this one done and move on to the next one[,]*" to which Affa replied, "OK."  (Id. at 11:00-11:16 (emphasis supplied).)  In other words, the Gronkowski "news announcement," as with all of the other planned press releases regarding Amogear, had one sole purpose: to help raise the price of the stock so that Affa, his codefendants, and the CW could profit handsomely by selling that stock to the public before proceeding to the next scheme.  As such, the shares themselves, in reality, had no value, as what they represented was simply a vehicle to engage in stock sales, rather than an actual business with assets, operations, and prospects for the future.

Moreover, as described in the PSR, Affa and his cousin (and codefendant) Andrew Affa traveled to Boston on September 6, 2013, to discuss the Amogear scheme with the CW.  (PSR ¶

18 (a copy of the recording of this meeting is being submitted to the Court as Exhibit F).)[5]

Among the many aspects of the scheme discussed on that day, the Affas and the CW joked about

the fact that the company that they were going to promote, and whose stock they were going to

sell into the market, consisted of nothing more than a cardboard box containing a miniscule

amount of sample items:

> MICHAEL AFFA: Isn't there a company or not really?
> CW: No.  There's the company right there [gesturing to the cardboard box in the corner].
> I mean--
> [Laughter.]
> CW: We've got some t-shirts, we've got some hoodies, we've got some boxing gloves.
> MICHAEL AFFA: Take a picture of that.
> CW:  Um, you know.
> MICHAEL AFFA: If somebody wanted, I mean, if somebody wanted an order for--
> CW:  Yeah, that'd be tough right now.
> MICHAEL AFFA:  For shirts, there's nothing?
> ANDREW AFFA: There's a website.
> CW: There's a website, the website's down, getting it back up.  We just kind of retooled
> it a little with some graphics and there's an order page that says "Coming Soon."
> MICHAEL AFFA:  There you go right there.
> CW: So if someone wanted to buy a shirt, not now but we'll get you one later, right.
> [Laughter.]
> MICHAEL AFFA: We got two mediums left.  What do you want?  I weigh 260... Eh,
> stretch it out a little bit.

(Exhibit F, Session 2, 28:26-29:05.)[6]  This was just one of several times during this meeting that

the CW reiterated that the company consists of nothing of substance.

A telling exchange between Affa and the CW also occurred on October 25, 2013.  In this

conversation, Affa was relaying the tale of another company which had had trading in its stock

halted by the SEC after it was promoted by an acquaintance of his.  In response, the CW inquired

---

[5] On this video recording, Michael Affa is seated on the right, and Andrew Affa is seated on the left.

[6] This notion that Amogear really consisted of nothing more than that cardboard box in the CW's office was reiterated during a January 29, 2014 meeting in Boston, in which Michael Affa participated by telephone (PSR ¶ 23), and which again caused Affa to react with laughter and jokes.

whether the SEC's halting order was at all related to the legitimacy of the company, since

Amogear, effectively, had no legitimate business:

> CW: . . . Did any of it [the halt] have to do like with the company?  Because what I'm
> thinking is we don't have anything going on right now, I mean, we just have . . . we've
> got some good press releases that we can put out, we just want to get this deal done as
> quickly as possible, but there's really nothing there . . . Were they [the SEC] questioning
> the quality of the company?  Like, that's one thing that I'm always concerned about.
> MICHAEL AFFA: They. . . like I said the first 15 minutes were about him and that, and
> his website and then they got into the questioning the company because this company did
> like life insurance policies that people could . . . buy them up for whatever, 60 cents on
> the dollar . . . they wanted to know if they still had this one policy and the lady was like
> 'yes, we absolutely do' . . . so the company was 100%, everything was legitimate,
> everything they stated was true, and everything they had is accurate and all that s**t, so
> they halted a legitimate company . . . .
> CW: So it's a real business?
> MICHAEL AFFA: Yeah, it's a real business . . . headquarters and auxiliary officers and
> everything so . . . little scary to . . . to think about the other one [Amogear], you know?
> . . .
> MICHAEL AFFA: There's no revenue in that other one [Amogear]?
> CW: No.
> MICHAEL AFFA: And there probably won't be?
> CW: No, no.  Not in this one.  Some other ones in the future we might, they might look
> better, but this one is, kind of, it is what it is right now, you know?
> MICHAEL AFFA: Yeah.

(Recording of 10/25/13 Call, submitted as Exhibit G, at 3:00-4:34.)

Notwithstanding these repeated descriptions of Amogear as a shell company with no

substance, Affa nonetheless deployed the websites that he controlled with several of his

codefendants to disseminate promotional e-mails to thousands of recipients.  Those e-mails

contained numerous false and misleading statements designed to give the misimpression that

Amogear had several product lines and items on the market which were ready to be sold.  (PSR

¶¶ 26-27.)

*Affa Led the Charge to Split and Deposit Amogear Shares.*

In order for the scheme to sell 17 million Amogear shares to progress, the shares had to

be deposited at a brokerage firm, from which they could be sold to the public once the

coconspirators had succeeded in artificially inflating the value of the stock.  Affa took control of this aspect of the scheme, informing the CW that he knew of numerous brokerages where the stock could be deposited, and ultimately selecting a Belize-based broker, Titan International Securities, Inc., as the landing spot for the Amogear shares.  (See PSR ¶ 37.)[7]  However, additional layers of concealment were necessary in order to be able to sell that amount of Amogear stock without restriction, and Affa provided that, too: he suggested three nominee companies which were purportedly unrelated—but which were all controlled by him—to which the Amogear shares could be assigned.  (See PSR ¶ 21.)  The purpose of this subterfuge was to conceal—from transfer agents, other brokers, and, ultimately, regulators and prospective investors—the fact that Affa and his coconspirators controlled virtually all of Amogear's outstanding shares.  (Id.)  To further ensure the secrecy of the true ownership of the shares, Affa orchestrated the signing of three different names to the debt conversion notices that opened the door to his three nominee companies getting access to, depositing, and clearing the Amogear shares.  (See PSR ¶ 37.)  Indeed, this chicanery was a necessary step in selling all 17 million of the shares that the coconspirators had discussed with the CW, since without a division of the shares into blocks purportedly owned by separate entities, there was a substantial risk that the shares would have been deemed as controlled by an "affiliate" of Amogear, which would have severely restricted the coconspirators' ability to sell them into the open market.  (PSR ¶ 38.)

> *In Furtherance of the Scheme, Affa Also Engaged in Coordinated Trading in order to Artificially Inflate the Value of Amogear Stock.*

Throughout their discussions, Affa often remarked to the CW that he had utilized the services of one or more traders in order to create an illusion that a given stock was trading at a

---

[7]  Indeed, even from the early conversations in which Affa and the CW discussed Affa's joining the Amogear scheme, in June 2013, Affa volunteered to the CW that he should "put [the Amogear stock] offshore" and that Affa had "a hundred places" where they could place the stock.  (Recording of 6/13/13 Call, submitted as Exhibit H, at 5:43-6:57.)

higher volume and value.[8]  Indeed, with regard to the 2012 pump-and-dump scheme involving

Greenway Technology ("GWYT") that Affa has admitted participating in (Statement of Facts

("Facts"), Docket Number 120-1, at 4), Affa arranged for a trader with whom he associated to

engage in activity that would artificially inflate GWYT's trading volume.  (See PSR ¶ 41.)[9]  In

line with those assertions, Affa took control of the aspect of the Amogear scheme that involved

coordinated trading of Amogear stock in order to create the appearance of an upward trend in

both price and volume (see PSR ¶¶ 18, 25.)  Indeed, on January 29, 2014, Affa, along with the

CW and coconspirators Mitchell Brown and Andrew Affa, discussed very specifically the

method by which they would "walk up" the Amogear stock price, planning to engineer

coordinated trades at 10 cents, followed by 12 cents, followed by 14 cents, until they reached 20

cents, which was the juncture at which the promotional campaign—and subsequent sell-off of

the stock—would commence.  (PSR ¶ 24.)  By that point, Michael Affa had already orchestrated

one coordinated trade—a sale of 10,000 Amogear shares at 10 cents a share—and he followed it

up by effecting additional trading, including a February 7, 2014, sale of 25,000 shares of

Amogear stock at 12 cents a share.  (PSR ¶ 25.)

---

[8]  So, for example, in a July 31, 2012, meeting in Boston unrelated to Amogear, Affa bragged
that one of his associates was a trader who could "show prints," in other words, as clarified on
the recording, create the illusion that there was legitimate trading going on.  (Recording of
7/31/12 Meeting, attached hereto as Exhibit I, at 1:09:51-1:11:03.)

[9]  The specific mechanism by which the trader did so, according to Affa, was by doing
"backfills," which is a term used to describe the practice of structuring a trade so that multiple
trades are reported to the market for what is effectively a single trade, with the result being that
the volume of trading reported to the market is artificially inflated.  On December 20, 2012,
Affa, in discussing GWYT, informed the CW that the trader he knew had done "backfills" so
that there was "more [trading] volume than actual."  (Recording of 12/20/12 Call, attached hereto
as Exhibit J, at 5:04-7:40.)

*Affa Intended to Sell the Amogear Stock Off at 15-20 Cents a Share.*

Affa's (and his coconspirators') ultimate goal in engaging in this pattern of deception was, of course, to drive up the value of the inherently worthless 17 million Amogear shares, so that they could sell them for significant gain. Affa, throughout his time discussing Amogear with the CW, made clear that he envisioned that the coconspirators could sell the Amogear shares off on the open market at $0.15-$0.20 a share and upward. The recordings are replete with Affa's statements to that effect:

- On June 13, 2013, Affa surmised that he and the CW could sell their entire position in Amogear—which, at that time, Affa was under the mistaken impression was 13 million shares, though the CW later informed him that the position was 17 million shares (PSR ¶ 30 n.3)—at an average of $0.20 a share. (Exhibit H at 16:51-17:59.)

- During the September 6, 2013, meeting between the CW and the Affas in Boston, Affa agreed with the CW that the *worst case* scenario was for them to sell the entire 17 million share position at $0.15 a share, with a best case scenario being that they could sell the stock at $0.25-$0.30 a share. (PSR ¶ 33.) However, Affa also noted that, if the coconspirators employed a specific trading strategy, they might be able to sell all 17 million shares at $0.50 a share. (PSR ¶ 33 n.5.)

- On January 22, 2014, Affa opined that the coconspirators could sell 13 million Amogear shares at $0.20 a share over the course of two-and-a-half weeks, if they were "somewhat patient[.]" (PSR ¶ 33.)

- On both January 29 and 30, 2014—approximately 10 days before the coconspirators launched their promotion of Amogear—Affa expressed his belief that they would be able to sell the Amogear shares off at an average of $0.15 per share. (PSR ¶¶ 33-34.)

Over and over, then, the view expressed by Michael Affa, during his conversations with the CW and others, was that they would be able to sell off the Amogear stock that they controlled at an average of at least 15 cents a share, and possibly quite a bit more if their promotion went well.

*Affa and His Partners Launch the Promotional Campaign.*

The coconspirators launched the Amogear promotional campaign between February 8-10, 2014. (See PSR ¶ 27.) In that time period, websites controlled by the Affas and Brown sent out

blast e-mails to thousands of recipients touting Amogear through the inclusion of various false and misleading statements about the company and the compensation that the entities sending the e-mails would receive.  (See id.)  On the morning of February 10, 2014 (which was a Monday), the SEC halted trading in Amogear stock before members of the investing public could make any purchases.  (See PSR ¶ 29.)

## ANALYSIS

As in all criminal cases, 18 U.S.C. § 3553(a) demands that the sentence imposed be sufficient, but not greater than necessary, to achieve the purposes set forth in that statute.  See 18 U.S.C. § 3553(a); see, e.g., Kimbrough v. United States, 552 U.S. 85, 101 (2007).  In fashioning a sentence, the Court is to consider the advisory United States Guidelines (the "Guidelines" or "USSG") range, and then proceed to review the factors set forth in Section 3553(a)(2), although the "weighting of those factors is largely within the court's informed discretion."  United States v. Gallardo-Ortiz, 666 F.3d 808, 811 (1st Cir. 2012) (internal marks and citations omitted).  18 U.S.C. § 3553(a) also "invite[s] the district court to consider, broadly, the nature and circumstances of the offense and the history and characteristics of the defendant and the need for the sentence imposed . . . to protect the public from further crimes of the defendant."  United States v. Politano, 522 F.3d 69, 74 (1st Cir. 2008) (internal marks omitted).  The statute also expressly calls for consideration of general deterrence.  See id.  The resulting sentence must be reasonable.  Kimbrough, 552 U.S. at 111.  Here, a sentence of 44 months is both reasonable and necessary to effectuate the purposes of 18 U.S.C. § 3553(a).

I.    Affa's Advisory Guidelines Range is 51 to 63 Months.

Under the plea agreement, both parties agree to the base offense level for the offense of conviction, and the application of an enhancement for the use of mass marketing under USSG §

2B1.1(b)(2)(A)(ii).  However, there is no agreement between the parties as to the applicability of

enhancements reflecting the amount of intended loss and the use of sophisticated means.  On this

score, the government concurs with the Probation Department's analysis, which concludes that

the intended loss amount falls between $1.5 million and $3.5 million (PSR ¶ 51) and that Affa

employed sophisticated means in advancing the fraudulent scheme (PSR ¶ 53),[10] resulting in an

advisory Guidelines range of 51 to 63 months.

    A.    <u>The Intended Loss Is an Amount Between $1.5 Million and $3.5 Million.</u>

This case was, in effect, an undercover sting operation, and therefore the scheme was

halted before any victims could incur an actual loss.[11]  Thus, the measure of loss here will be one

of intended loss.  <u>See</u> USSG § 2B1.1, cmt. n.3(A) (2015).  Intended loss "(I) means the

pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended

pecuniary harm that would have been impossible or unlikely to occur (<u>e.g.</u>, as in a government

sting operation . . .)."  <u>Id.</u> n.3(A)(ii).  "[A] sentencing court is permitted to determine the amount

---

[10]  While Affa reserved the right to contest the applicability of a sophisticated means
enhancement, he did not register an objection to the PSR's inclusion of that enhancement in the
advisory Guidelines calculation.  Nor could he, really, as Affa's conduct in planting Amogear
stock in the offshore accounts of three nominee companies he controlled (<u>see</u> Facts at 2) fits the
sophisticated means enhancement to a tee.  According to the Guidelines, the sophisticated means
enhancement is meant to address "[c]onduct such as hiding assets or transactions, or both,
through the use of *fictitious entities, corporate shells, or offshore financial accounts* . . . ."
USSG § 2B1.1 cmt. n.9(B) (emphasis supplied).  This is precisely what Affa did.  Moreover, the
Amogear scheme arguably was sophisticated even if one ignores Affa's use of corporate shells
and offshore financial accounts: the coconspirators spent months planning the scheme; they
employed a lawyer to draft legal opinion letters concerning federal securities laws; and they
orchestrated and coordinated stock trading on a national market and a promotional campaign.
Therefore, the sophisticated means enhancement plainly applies here, because "the offense as a
whole shows a greater level of planning or concealment' than a typical fraud of its kind."  <u>United
States v. Pacheco-Martinez</u>, 791 F.3d 171, 178 (1st Cir. 2015) (internal marks and citation
omitted).

[11]  This is in contrast with the GWYT scam, which Affa acknowledges participating in, and
which was an actual pump-and-dump scheme brought to fruition that resulted in the sale of
$855,586 worth of GWYT stock into the market.

of intended loss based on a reasonable estimate."  United States v. Iwuala, 789 F.3d 1, 13 (1st

Cir. 2015) (citations omitted).

Determining the loss amount in this case is relatively straightforward because, unlike

pump-and-dump schemes involving real, functioning companies whose uninflated stock may still

have some inherent value, there can be no legitimate argument that Amogear's stock was worth

anything at any time, or would have been worth anything after the dump: Amogear "was a shell

company with no real operations."  (Facts at 1.)  Indeed, as described supra, the CW pointed out

to Affa on numerous occasions that the company was devoid of any value.  In such

circumstances, then, Amogear stock was plainly worthless at the time that Affa and his

coconspirators were planning to inflate its value and dump it onto unsuspecting investors.  See

United States v. Zolp, 479 F.3d 715, 719 (9th Cir. 2007) ("If the company whose stock is sold

does not legally exist or has no activities, assets, facilities, or any other source of value, that

'company' has no underlying equity.  Absent highly unusual circumstances, its stock would also

be worthless.") (citation omitted); United States v. Schwamborn, No. 06-CR-328 (SJF), 2012

WL 6050561, at *3 (E.D.N.Y. Dec. 3, 2012) ("Defendant was responsible for inflating the price

of securities that were inherently worthless; World Cyberlinks produced nothing, earned nothing,

and had no assets.  In short, the victims' loss on the stock is solely attributable to the fraud.")

(citing United States v. Rutkoske, 506 F.3d 170, 180 n.4 (2d Cir. 2007)).

Thus, as Amogear's stock was inherently worthless, a reasonable estimate of the

pecuniary harm that Affa and his coconspirators sought to inflict on market participants is the

amount of shares intended to be sold multiplied by the aspired-to price at which the conspirators

intended to sell them.  As detailed above, Affa himself, in numerous conversations, repeatedly

stated his steadfast belief that, at worst, the coconspirators would be able to sell their entire

position at $0.15, if not $0.20 and above.  Moreover, that price target makes sense given that his coordinated trading, in the lead-up to the promotion, was conducted at $0.10 and $0.12 per share. Based on the defendant's own stated goals, then, the intended loss would be between $2,550,000 (if the 17 million shares were sold at an average of $0.15) and $3,400,000 (if the 17 million shares were sold at an average of $0.20).[12]

The Third Circuit in United States v. Margulies dealt with a starkly similar situation when it affirmed a district court's decision to calculate intended loss by multiplying the aspired-to price to which the stock would increase during a stock manipulation scheme by the number of shares held by the defendant: "in seeking to inflate the stock price from 30 cents per share to $2.00 per share, [the defendant] intended a $1.70 per share loss with respect to the 1,475,380 shares he owned or controlled."  United States v. Margulies, 442 Fed. App'x 727, 731 (3d Cir. 2011); see also United States v. Reifler, 446 F.3d 65, 109 (2d Cir. 2006) (the "planned inflation by $5 a share, given [the defendant's] plan to dump 1.5 to 2 million shares at the inflated price, indicated an intended loss to shareholders of $7.5 million to $10 million") (internal marks and citation omitted).  Here, too, the analysis is as straightforward, with the difference being that the inflation of Amogear stock started from a value of zero, which Affa and his coconspirators sought to raise to $0.15-$0.20.  And even this is a conservative estimate, given that Affa

---

[12]  As part of his PSR objections, Affa argued that intended loss must be calculated by considering the defendant's subjective intent, rather than some hypothetical potential loss, relying on the Third Circuit case United States v. Geevers, 226 F.3d 186 (3d Cir. 2000) in support of this proposition.  If anything, that case (and Affa's argument) firmly endorses the PSR's intended loss analysis, which is explicitly based on Affa's own words in recorded conversation—evidence of his subjective intent could hardly come any better.  A theory of "potential loss" would be if the government were arguing that the coconspirators' promotional campaign could have gone far better than their wildest dreams, and therefore the Amogear stock price could have skyrocketed to, say, $5 a share, resulting in a "potential loss" of $85 million. This is not, however, the government's analysis, nor is it the PSR's.  The government's analysis is based strictly on Affa's subjective intent, as expressed by Affa himself.

explicitly stated, during the September 6 meeting for example, that the coconspirators may be able to sell off the stock at $0.50 a share.[13]

At the end of the day, the PSR's admittedly conservative (see PSR ¶ 51) estimate of intended loss is amply supported by the indisputable facts that Amogear stock had no value and Affa and his coconspirators consistently aspired to sell the 17 million shares they controlled at between 15 to 20 cents on average.  This easily brings the defendant within the Guidelines' $1.5-$3.5 million loss level, even more so when the GWYT losses are considered.  (See PSR ¶ 51.)  Once the sophisticated means enhancement is factored in as well, Affa's advisory Guidelines range is 51-63 months.

II.    A Sentence of 44 Months is Reasonable and Necessary to Effectuate the Purposes of 18
       U.S.C. § 3553(a).

       The government believes that 44 months is a period of incarceration that would best reflect the goals of 18 U.S.C. § 3553(a), particularly the need for deterrence and for the sentence

---

[13]  In his objections to the PSR, Affa half-heartedly argued that the PSR's intended loss figure is too high because it was unlikely to occur, supporting this theory by citing a Tenth Circuit case for the proposition that "the loss subjectively intended by a defendant should not control when the economic reality is that the probable or actual loss could not in any circumstances have exceeded a discernible lesser amount."  United States v. Galbraith, 20 F.3d 1054, 1059 (10th Cir. 1994) (internal marks and citation omitted).  This argument is unavailing for several reasons.  First, the cited authority is contrary to First Circuit precedent, see Iwuala, 789 F.3d at 13 ("Intended loss may include even those losses that were impossible or unlikely to occur . . . ." (internal marks and citation omitted), the Third Circuit case that the defendant also cites, see Geevers, 226 F.3d at 195 (repudiating Galbraith), and, as Affa acknowledges, the Guidelines themselves, see USSG § 2B1.1, cmt. n.3(A)(ii).  See also Margulies, 442 Fed. App'x at 730 ("to the extent Margulies is arguing that a $1.70 per share loss was not possible because, over the course of the scheme, the stock price would have increased for reasons unrelated to the fraud, this Court has made clear that the government's burden is to prove intended, not possible, loss.") (internal marks and citation omitted).  Second, even if Galbraith held any sway, Affa's objection that the sale of all 17 million shares at 15-20 cents was "not likely" does not mean that it was not possible.  Third, Affa himself, in discussions with the CW, noted occasions where promotional campaigns resulted in more than a million dollars' worth of stock sales.  (See, e.g., Exhibit C at 0:00-1:03.)

to reflect the seriousness of the offense and promote respect for the law.  In this regard, several facts about this case merit particular attention.

      A.    <u>A Sentence of 44 Months Would Reflect the Seriousness of the Offense, Promote Respect for the Law, and Act as a Specific Deterrent.</u>

The conduct which led to Affa's conviction—an organized, sustained plan to systematically inflate the stock value of a shell company that existed on paper only in order to push that stock on the investing public—is serious, particularly in light of Affa's history of participation in the shadowy world of penny stock promotion.  In the Background section above, the government has cited only a sliver of the conversations between Affa and the CW, but even that sliver reflects with striking clarity how deeply immersed in the world of pump-and-dumps Affa was.  He bragged about working with traders who were well-versed in creating a façade of legitimate trading in a stock to bolster its value—and, indeed, had previously engaged in just such activity with a trader as part of the GWYT scam.  (PSR ¶ 41.)  He assured the CW that, when it came time to splitting up and depositing the Amogear stock in order to conceal its true ownership, he had "hundreds" of places where he could do so, and he made true on that promise when he took ownership of that aspect of the Amogear scheme.  Affa had at his disposal three nominee companies which he volunteered as entities in whose names the stock could be deposited, while concealing his control over them.  He also provided the connection to the offshore brokerage which could hold the Amogear stock.  Furthermore, he, along with his cousin Andrew and Mitchell Brown, controlled some of the websites that sent out false promotional materials, not only with regard to Amogear, but also GWYT a couple years before.

Affa was not some neophyte to whom the fine points of a pump-and-dump scheme had to be explained; Affa had been yearning for he and the CW to take control of a shell company in order to promote it and sell off the stock, and he jumped at the opportunity to do so with

Amogear.  The fact that Amogear had absolutely nothing going for it—no operations, no actual production of apparel, no assets other than a cardboard box in a dusty South Boston office, no future other than as a vehicle for stock manipulation—did not deter Affa from planning to sell off 17 million shares of its worthless stock by spinning yarns about its nonexistent product lines.  In fact, he actually chortled, on tape, at the notion that the company was nonexistent.  In this regard, it was readily apparent that Affa could not care less about the investors who were ultimately left holding the bag, owners of a stock that had no value while Affa and his coconspirators bounced to the next shell company that they could control and promote for a profit.  Affa cared about one thing only: selling stock, and building up the best story by which to wring the maximum value from that stock, whether it was by false statements about the company, phony headlines, or trades he coordinated in order to create the appearance of the stock price inching up.  The fact that the ultimate owners of Amogear stock would be shareholders in a company that consisted of no more than a box with a handful of t-shirts was a source of mirth, rather than a cause for concern, for him.

The seriousness of Affa's offense is also fairly reflected by a consideration of how difficult it would have been to detect had this scheme not been part of an undercover sting.  It is illuminating to consider the opacity of the fraudulent conduct here.  The stock that was destined to be sold to the public was stashed in offshore accounts, and divided up amongst nominee companies.  In a non-sting scenario, the mere ownership of the stock would have been exceedingly difficult to trace—indeed, that was part of the purpose for the subterfuge.  Moreover, Affa's promotions falsely claimed that the promoting entity had received a cash payment, rather than the fact that Affa had a stake in the stock ownership; again, had this not been a sting and had regulators questioned Affa about his Amogear promotions, he could have

feigned ignorance and asserted that he was merely an innocent promoter getting paid a fee.  The

coordinated trades that Affa orchestrated were likewise not done in his name.  In other words, the

conduct here, as with so many pump-and-dump schemes, was specifically designed to conceal

the true nature of the activity from regulators, law enforcement, and the investing public.  It is

only by virtue of the fact that this was a sting operation, and that Affa's conversations with the

CW were recorded, that we can now see the truly nefarious nature of Affa's actions.  With those

actions laid bare through those recordings, the seriousness of Affa's conduct cannot be

overstated.  Affa was a seasoned operator in the world of pennystock promotions who was

recorded enthusiastically participating in every key aspect of a classic pump-and-dump scheme.

The readiness with which he involved himself in the scheme, and the many steps that he

personally undertook to ensure its success, are a fair reflection of his culpability.  That

culpability would be appropriately addressed by a sentence of 44 months of incarceration.

     B.     The Court's Sentence Should Also Provide a General Deterrent to Other Pump-
          and-Dump Malefactors.

As a general matter, the First Circuit, along with other courts, has noted the significance

of sentences that promote general deterrence in the cases of white collar defendants.  See United

States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (the deterrence of white collar crime was

"of central concern to Congress" in fashioning sentences for white-collar crime); United States v.

Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are

more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes

are prime candidates for general deterrence.  Defendants in white collar crimes often calculate

the financial gain and risk of loss, and white collar crime therefore can be affected and reduced

with serious punishment.") (internal marks and citations omitted) (emphasis supplied); United

States v. Ture, 450 F.3d 352, 358 (8th Cir. 2006).

This case brings together two worlds that operate in the umbrae of the securities universe: penny stocks and stock promotions.  The penny stock arena has a particular vulnerability for fraudulent schemes, as penny stocks are traded in the less regulated microcap market, where there is not much, if any, disclosure of information to investors or oversight by regulators.  Here, the specter of fraud looms large, particularly when married to the business of stock promotions, designed to reach thousands of potential investors at a time without taking any heed of whether the statements those investors read about a company are true or not.  In this case, Affa stands as a paradigmatic actor of exactly how the criminal element can take advantage of the lack of transparency inherent in penny stock trading to attempt to fleece investors by presenting them with a golden opportunity to invest in a company which is, in reality, completely worthless.  As discussed above, the conduct is all the more pernicious given that people like Affa take measures to conceal their activity.  The sentence imposed on Affa, therefore, should be one that sends a clear message to all others who would engage in similar unlawful activities, thinking that the opacity of the penny stock world provides cover for them: if they are caught, they will face significant consequences.

**CONCLUSION**

For the foregoing reasons, the government respectfully submits that a sentence of 44 months of imprisonment is not only reasonable, but also necessary to effect the purposes of 18 U.S.C. § 3553(a).  The United States respectfully requests that the sentence include a fine of $100,000, 36 months of supervised release, and a mandatory special assessment of $700.


Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:    */s/ Vassili Thomadakis*
VASSILI THOMADAKIS
Assistant U.S. Attorney

ANDREW J. PALID
ERIC A. FORNI
Special Assistant U.S. Attorneys

Dated: February 5, 2016

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: February 5, 2016

*/s/ Vassili Thomadakis*
VASSILI THOMADAKIS
